2021 IL App (1st) 181617-U

No. 1-18-1617

Order filed August 25, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 9479 |
| | ) | |
| BREILY SOTOMAYOR-QUAN, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*: Conviction for attempt first-degree murder affirmed. State proved intent to kill beyond reasonable doubt. Eight-year sentence is not excessive.

¶ 2   Following a bench trial, defendant Breily Sotomayor-Quan was convicted of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)) and sentenced to eight years in prison. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he had the specific intent to kill his girlfriend and that his conviction for attempted first degree

murder should therefore be vacated and the case remanded for sentencing on the merged count of aggravated domestic battery. Defendant also contends that his eight-year sentence is excessive. For the reasons that follow, we affirm.

¶ 3                                                      BACKGROUND

¶ 4     This case began when defendant was arrested and charged by information with one count of attempted first degree murder, one count of aggravated domestic battery, and one count of unlawful restraint. The case proceeded to a bench trial.

¶ 5     At trial, Amber Rivera testified that in May 2017, she had been dating defendant for three and a half years and had been living with him for three years. On May 22, 2017 at around 4 p.m.—after three days of arguing—Rivera woke defendant up so he could take a shower before work. On his way to the bathroom, defendant asked Rivera which of them was going to move out of the apartment. Rivera stood in the bathroom doorway and argued with defendant for a few minutes. Defendant asked her to step out so he could shower. Rivera stepped into the hallway and told defendant to "make sure he knew what he was doing in terms of the breakup."

¶ 6     Defendant dropped his clothes on the bathroom floor and stared at Rivera with a "look of anger" she had never seen before. Defendant's expression scared and worried Rivera, so she began to walk slowly backwards toward her keys, which were in the kitchen. Defendant walked into the kitchen and Rivera told him she was going to leave. As she reached for her keys, defendant raised his arm. Rivera assumed he was going to hit her, so she turned her back to him.

¶ 7     Defendant pushed Rivera into the kitchen wall, placed his right hand on the front of her neck, and wrapped his left arm around her neck, restricting her airway and allowing her to breathe, in her words, "very little." Rivera tried to extricate herself from defendant's grip by pulling at his

arm and hand. During the struggle, they both fell to the ground. Defendant, who was still holding Rivera's neck, landed on top of Rivera, who was face down. Defendant repeatedly told Rivera that he was going to kill her, that she deserved to die, and that she was going to die that day. He continued to choke Rivera with his hand and arm and she continued to try to pull his hands off her. Rivera explained that the longer he squeezed, the less she could breathe and, just as "[e]verything started to get very blurry," defendant released her.

¶ 8        As Rivera was getting up off the floor, defendant pushed her. She retrieved her phone from a nearby shelf and told defendant that if he let her get her keys and leave, she would never speak of what happened. Defendant stood in front of her keys and told her to put her phone down or she would regret it. When Rivera stated that she wanted to leave, he grabbed her phone from her hand, threw it across the room, backed her into a corner, and began to insult her. Rivera, who was shaking and crying, agreed with everything he said in an attempt to calm him down. Defendant told Rivera to stop shaking and crying, and she told him she could not.

¶ 9        Rivera tried to slide to her left to get to her keys. Defendant moved with her and blocked her access to the keys. He told Rivera she was not going anywhere and that he still had 30 minutes "to play and have fun." Rivera understood this to mean he had 30 minutes before he had to go to work. At this point, Rivera started walking toward the front door. She was limping because she had hurt her knee when she fell on the floor and it was swollen. Defendant told her to stop pretending he had done something to her leg. When Rivera told defendant that her leg hurt, he said if she did not stop limping, he would "break it for real." Defendant picked up Rivera's phone, placed it in his pocket, and said if she did not stop shaking and crying, he would give her "a real reason to be scared."

¶ 10    Defendant then grabbed Rivera, threw her to the floor, and repeated that he would give her a real reason to be scared. He got on the floor behind her, wrapped his arm around her neck, and began to squeeze. "With the little breath [she] had," Rivera asked him to let her go and tried to pull his arms off her. She tried to scream, but defendant pinched her neck, told her to shut up, and said she would die in silence where no one would hear her. While continuing to choke Rivera, defendant wrapped his legs around her waist and squeezed. He told Rivera he was going to do her daughter a favor by killing her. Rivera stated that "everything went blurry again," "[e]verything started to get very dark," and her body felt limp. Just as she began to feel like she could not breathe anymore, defendant let go and asked her if she wanted to leave. When Rivera nodded, defendant told her to hurry up before he decided to finish what he started.

¶ 11    Rivera got up and tried to open the front door twice, but both times, defendant pushed her into the door, closing it. He pushed a floor lamp toward her, but she caught it and stood it back up. Defendant threw the lamp toward a wall and Rivera ran out the front door.

¶ 12    After Rivera ran about a block and a half, a woman asked if she needed help. As the woman called Rivera's mother, defendant pulled up in his car. He screamed insults at her and said he would finish what he started. Rivera hid in an alley and then went to a friend's house. Her mother picked her up and took her to the hospital. On the way, her mother took pictures of her. At the hospital, Rivera spoke with police officers, who also took pictures of her. The photographs were admitted into evidence at trial. Rivera testified that while she was at the hospital, her neck was very sore and she could hardly move it. Her knee also hurt "really bad" to the point that she was "barely able to walk on it." Both her neck and knee were sore for the next few days.

¶ 13    On cross-examination, Rivera estimated that about 30 to 45 minutes elapsed between the time she woke defendant and the time she left the apartment. Rivera acknowledged that the police were called to their apartment in April 2017, when she and defendant had an argument. At that time, she told the police that defendant had shoved her. The police told her they would not arrest defendant because she had committed a crime first by restricting his movement and not allowing him to leave. Rivera stated that the argument in May 2017 began when defendant saw text messages and assumed she cheated on him. Rivera admitted testifying at the preliminary hearing that the altercation on May 22, 2017, began at 3 p.m., rather than 4 p.m.

¶ 14    Defendant testified that on the afternoon in question, he fell asleep while contemplating whether to forgive Rivera for being unfaithful or end their relationship. When he woke, he saw Rivera in the kitchen. He told her to think carefully "about what she was going to do with the apartment." Defendant then retrieved some clothes from the basement and went into the bathroom to take a shower. Rivera followed him into the bathroom. She told him she was stupid, that she did not know what she was thinking when she slept with a married man, and that she wanted to be with defendant. She said she understood if defendant wanted to leave, but asked for a last hug and kiss. Defendant refused.

¶ 15    Defendant asked Rivera to let him out of the bathroom, but she blocked the doorway. When defendant hit the bathroom door with his fist, she took a step back and "planted" herself in the hallway. Defendant asked her to move so he could go to his sister's house to shower, but she did not move. Defendant grabbed the front of Rivera's neck with his left hand to move her out of the way so he could leave the apartment. He did not squeeze her neck to strangle her and did not attempt to cut off her air. Defendant and Rivera "started to fight." Rivera grabbed defendant's shirt

and defendant grabbed Rivera's neck with his right hand. Again, defendant did not squeeze Rivera's neck to strangle her or try to cut off her air. They fell to the ground. Defendant landed on top of Rivera and hit his mouth on the floor.

¶ 16     After defendant and Rivera both stood up, Rivera started limping toward the apartment's front door. Defendant told her to stop walking like that because he never hurt her leg. Rivera responded that her leg pain was not his fault, as she hurt herself when she fell. She went into the kitchen and retrieved her phone. Defendant asked her "what she was gonna do because she always looks for a third person when there are problems." Rivera stated that she wanted to call her mother and leave. Defendant told her it was not necessary for her to call her mother or anyone else and that she could leave her phone. Defendant denied taking Rivera's phone from her and denied throwing it across the room.

¶ 17     Rivera lowered her phone to the floor and told defendant she did not know what she was thinking, throwing away her relationship with him for a person "who wasn't worth it." This made defendant upset, as Rivera had been saying similar things for the last three days. He felt frustration, ire, sadness, stress, and anger. He asked Rivera to stop repeating herself and shut up. Rivera started limping toward the kitchen, where her keys were hanging on the wall. Defendant picked up her phone from the floor, rushed to the kitchen, grabbed the keys, and put them in his pocket. He explained that he did this because "at first I was asking her to let me leave and she wouldn't let me leave, and now it was her that wanted to leave and I was doing the same thing she did to me to her."

¶ 18     Defendant and Rivera began another physical struggle and fell to the floor again. Defendant landed with his right arm and leg underneath Rivera. When she kicked him, he joined his legs

together to stop her. Rivera twisted her body so that she was face-down and defendant "ended up" on top of her with his right arm on her neck. He did not put his arm there on purpose to choke her, did not strangle her, and did not try to cut off the air she was breathing. Defendant testified, "I suddenly felt that Mrs. Rivera remained calm, but I was surprised at that point that she wasn't breathing normally and I got off from her right away. However I could, I stood up and I went to the main door and I told her to get out of there."

¶ 19    Defendant held the front door open. Rivera stood up and, as she was limping toward the door, tripped over the cord of a floor lamp near the door, causing it to fall on her head. Defendant grabbed the lamp, tossed it aside, and closed the door behind Rivera. A minute or two later, he went to his car. After driving about a block and half, he saw Rivera talking with a woman. He stopped his car and told Rivera, "[A]sk for help like you have all done it." He denied telling Rivera that he was going to finish what he started.

¶ 20    Defendant denied ever telling Rivera that she deserved to die, that she was going to die that day, or that he was going to give her a reason to be scared. He acknowledged telling Rivera that if she kept limping, he was going to give her a reason to continue "walking on her side." He also admitted saying he still had 30 minutes to play with her, but explained, "I meant do the same thing to her that she was doing to me by not letting me out of the apartment. I was going to do the same thing to her." Defendant denied trying to kill Rivera.

¶ 21    The trial court found defendant guilty of attempted first degree murder, aggravated domestic battery, and unlawful restraint, and merged the latter counts into the attempted first degree murder count. In announcing its decision, the court noted defendant's testimony that he was surprised at one point that Rivera was not breathing normally. The court stated:

"I am not surprised. When you put your hands on another human being's throat and squeeze, that's the intent. *** [W]hen you grab somebody around the throat, you are making a statement. When you keep your hands around the throat, you are making a stronger statement, and then when you throw in and add to the mix the language that was used here, according to Ms. Rivera, which demonstrated an intent to take her life, it's not an accident."

¶ 22    With regard to the charge of attempted first degree murder, the court stated that "[i]t is probably the hardest crime to prove because one has to prove an intentional desire and intent to kill another person." The court found that the State had proved that intent beyond a reasonable doubt. In making this finding, the court explained that it relied on the combination of defendant's actions and words. Specifically, the court highlighted that defendant put his hands around Rivera's throat and strangled her while stating that he wanted to kill her.

¶ 23    Defendant filed a motion for a new trial. At the hearing on the motion, defense counsel argued, *inter alia*, that the State had not proved beyond a reasonable doubt the intent necessary to sustain the charge of attempted first degree murder. The court rejected the argument, stating as follows:

"[W]ith respect to the proof question regarding the intent to commit the crime of first-degree murder, there were multiple examples of—demonstrating the defendant's intent.

Certainly his actions that I found credible from the complaining witness's testimony and the entirety of the evidence of placing his hands around her throat, choking her such that she had difficulty in breathing.

And then when you combine that with the defendant's statements to her that she attributed to him during the course of her testimony where he makes statements that I'm going to kill you, you deserve to die, you're going to die today, repeatedly saying you're going to die; and then telling her, the complaining witness, that she should stop shaking, she should stop crying, stop limping. I have another half hour to play with you."

The court observed that defendant may not have had the constant intent to kill Rivera at "every single one of those moments" throughout the "lengthy ordeal that the complaining witness endured," but explained that this was not necessary for a finding of intent. The court denied the posttrial motion.

¶ 24 At sentencing, the trial court indicated it had read defendant's presentence investigation (PSI) report. The PSI report reflects that defendant had no prior convictions or juvenile adjudications of delinquency. Defendant reported to the probation officer who prepared the PSI report that he was born in Guatemala and had a "sad" childhood due to being physically abused by his father, who was an alcoholic. However, defendant reported a close relationship with his parents and his maternal siblings. He left school at 16 for financial reasons and moved alone to the United States at 17 to find employment and assist his mother financially. Prior to incarceration, he worked as a cook at a number of restaurants in the Chicago suburbs. He also attended Harper College in Palatine. He had no children, denied past or present affiliation with any street gang, and denied using alcohol or any illicit drugs. He reported that he was under the care of a psychiatrist and was taking medication for depression and sleep problems.

¶ 25 The State presented the testimony of a correctional officer, who related that he had reviewed surveillance video of a fight that broke out in the Cook County jail while defendant was

housed there. Defendant was not initially involved in the fight, but at one point, chased another detainee and struck him with a "soap sock." The officer explained that a soap sock is "something that's filled with bars of soap tied up and used like a weapon." The State indicated that defendant had been charged with mob action, but that it was nol-prossing the charge.

¶ 26    The State read a victim impact statement prepared by Rivera, in which she related that as a result of the incident, she had been depressed and experienced flashbacks, nightmares, night terrors, and disassociations. She further stated she feared ever having "a relationship with anyone ever again." The State asked the court to impose a substantial sentence based, mainly, on the seriousness of the offense. The State also argued that the mob action case was aggravating.

¶ 27    Defense counsel argued in mitigation that defendant was raised by an abusive, alcoholic father and moved to the United States alone at 17 so that he could send money to his mother. Counsel highlighted that defendant had no criminal history and argued that the altercation with Rivera was an isolated incident that got out of control. Counsel reported that during their meetings, defendant was well-spoken, introspective, and respectful, and that although defendant did not finish high school, he attended Harper College to obtain his G.E.D. and improve his English. Defendant also worked two jobs in order to provide for himself, send money to his mother, and help Rivera financially. Counsel also noted that Rivera continued to communicate with defendant for months after the incident. Most notably, prior to defendant's arrest, Rivera sent him messages asking him to hide with her in Texas for a year, until "this could die down," so that they could fix their relationship. Defendant did not leave Illinois, but rather, stayed with his brother and continued working until his arrest. With regard to the altercation in jail, counsel asserted that defendant

carried the "soap sock" for protection, as he was not in a gang and was small in stature, and noted that defendant did not start the incident. Counsel urged the court to impose the minimum sentence.

¶ 28    In allocution, defendant asked for forgiveness from Rivera's family and God. He stated that he had a lot of anger and stress in his life at the time of the incident, made a mistake, and wanted an opportunity to show the kind of person he really was. Defendant stated that he understood he had done something wrong, but "all of that has also caused a big change in my life." Defendant concluded by asking for forgiveness.

¶ 29    Prior to pronouncing sentence, the trial court acknowledged the harm caused to Rivera and expressed hope that she would have a fulfilling life. The court noted that Rivera had endured a "uniquely aggravated, extended ordeal" that lasted 30 to 45 minutes and was of a "somewhat sadistic nature." The court stated it was aggravating that defendant not only strangled Rivera and cut off her air, but also made many comments to her that she was going to die. The court stated, "[R]arely in my experience *** do you see somebody continue on and sort of almost terrorize the person by telling them what their fate is, almost to the point of enjoying it. Those aspects of his case, I think, are appropriate to consider in aggravation."

¶ 30    The court stated that, while the incident in Cook County jail was "nothing to brag about," defendant was slight in build and many of the other inmates were violent people, such that it could understand how defendant might want to be able to defend himself from any potential attack by possessing a "soap sock." The court observed that it was difficult to assess just what defendant did during the melee depicted on the video, or in fact, whether the person depicted with the "soap sock" in the video was in fact defendant. As such, the court stated it was placing little weight on the video.

¶ 31    The court observed that defendant had no prior criminal history. The court also noted defendant's employment history, education, lack of substance abuse, and history of being raised by an abusive and alcoholic father. The court stated it was giving defendant "a little credit" for accepting responsibility at sentencing, but contrasted defendant's statement in allocution with his trial testimony, during which he blamed Rivera for the incident, "almost like she put her throat in his hands" and limped to aggravate him.

¶ 32    In conclusion, the court stated it had given much thought to the factors in aggravation and mitigation, defendant's age at the time of the crime, and the factual circumstances. The court imposed a sentence of eight years' imprisonment and denied defendant's motion to reconsider sentence. Defendant filed a timely notice of appeal.

¶ 33                                    ANALYSIS

¶ 34    Defendant first challenges the sufficiency of the evidence to sustain his conviction for attempted first-degree murder. He claims the State failed to prove beyond a reasonable doubt that he had the specific intent to kill Rivera.

¶ 35    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). The testimony of a single witness, if positive and credible, is sufficient to convict. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

Reversal is justified only when the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 36    "The offense of attempted murder is shown when the State proves, beyond a reasonable doubt, that the defendant, with the specific intent to kill, commits *any act* which constitutes a substantial step toward the commission of murder." (Emphasis in original.) *People v. Valentin*, 347 Ill. App. 3d 946, 951 (2004). A defendant's intent is a question of fact to be determined by the trier of fact. *Id.* Intent can be inferred from surrounding circumstances, such as the character of the attack, use of a deadly weapon, and severity of injury. *Id.*; see also *People v. Williams*, 165 Ill. 2d 51, 64 (1995)). Intent can also be inferred "from an act, 'the direct and natural tendency of which is to destroy another's life.' " *Valentin*, 347 Ill. App. 3d at 951 (quoting *People v. Hill*, 276 Ill. App. 3d 683, 688 (1995)).

¶ 37    Defendant notes that, according to Rivera's testimony, both times he strangled her, he released her once she stopped struggling and before she lost consciousness. And after the second release, he told her to leave the apartment. He maintains that these actions are inconsistent with the specific intent to kill required to prove attempted murder. Defendant asserts that, given that he engaged in no advanced planning and did not use a deadly weapon, and the character of the assault indicated he only wanted to hurt Rivera, the surrounding circumstances do not permit a rational fact finder to infer beyond a reasonable doubt that he had an intent to kill. He further argues that the statements he made during the offense did not establish he intended to kill Rivera, as that he released her both times he strangled her "and never followed through on his threats."

¶ 38    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant had the specific intent to kill Rivera. Defendant's intent

to kill Rivera can be inferred from his conduct throughout the attack. Rivera testified that defendant strangled her twice in the span of 30 to 45 minutes. During the first strangulation, defendant choked her and squeezed her neck until "[e]verything started to get very blurry." Similarly, during the second strangulation, defendant choked Rivera until her vision went blurry and dark and her body felt limp. "Evidence that the defendant committed a voluntary and willful act such as choking, which has the natural tendency to cause death, is sufficient to prove the intent required for the offense of murder." *People v. Glazier*, 2015 IL App (5th) 120401, ¶ 16, *vacated on other grounds*, No. 119867 (Ill. Mar. 25, 2020); see also *People v. Leach*, 405 Ill. App. 3d 297, 313 (2010) ("the natural tendency of strangling another human being for three to six minutes is to destroy that person's life").

¶ 39 The fact that defendant let go of Rivera's neck before she died is undeniably a factor in his favor and makes this a close case. It might mean, as defendant argues, that he never intended to kill her in the first place. But it might also mean, as the State argues and as the trial court found, that he did intend to kill her at times but then changed his mind at other times, as his rage ebbed and flowed throughout the highly fluid and emotional encounter. Once the elements of attempt murder are completed, abandonment of the criminal purpose is no defense. *People v. Myers*, 85 Ill. 2d 281, 290 (1981); see also *People v. Parker*, 311 Ill. App. 3d 80, 90 (1999) (abandonment is not defense to criminal attempt). The record shows a close case, but it does not compel us to conclude that the trial court's factual conclusion was wrong, and defendant's is correct.

¶ 40 And while intent is usually inferred from circumstantial evidence, here, the State was also able to present direct evidence of defendant's mental state because he made multiple verbal threats to Rivera, stating his intent to kill her. *People v. Schlott*, 2019 IL App (3d) 160281, ¶ 42. The first

time defendant strangled Rivera, he repeatedly told her that he was going to kill her, that she deserved to die, and that she was going to die that day. During the second strangulation, defendant told Rivera she would die in silence and that he was going to do her daughter a favor by killing her. This evidence and the reasonable inferences therefrom were sufficient to sustain defendant's conviction for attempted first degree murder.

¶ 41    Defendant argues that an assailant's statement during an offense that he is going to kill the victim does not necessarily reflect a true, specific intent to kill. Of course, such statements do not *automatically* reflect a sincere attempt to commit murder—they may just be used to instill terror—but neither is it automatic that they do *not* reflect that intent. It is one piece of information for the factfinder to include in its overall assessment of the evidence.

¶ 42    This court, to be sure, has encountered cases where the evidence failed to show intent to kill despite threatening statements made by the defendant. See, *e.g.*, *People v. Jones*, 184 Ill. App. 3d 412, 430-31 (1989); *People v. Thomas*, 127 Ill. App. 2d 444, 446-47 (1970). But no two sufficiency challenges are alike; we are not required to overturn a verdict just because another court overturned a verdict in a case involving *some*, not all, of the same facts.

¶ 43    In any event, *Jones* and *Thomas* are distinguishable. In *Jones*, 184 Ill. App. 3d at 430, this court stressed that the defendants did not shoot a gun or use a knife they had in their possession and thus found that "[t]he character of the attack on [the victim] was not of the type that justifies an inference of an intent to kill." *Jones*, 184 Ill. App. 3d at 430. In *Thomas*, the defendant picked at the victim's face with a knife, beat her head against a chest of drawers, raped her, robbed her, stabbed her in the shoulder, and fled. *Thomas*, 127 Ill. App. 2d at 455. This court found "that the

opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime." *Id.* at 456.

¶ 44    In each of those cases, the defendants possessed a deadly weapon that easily could be used to kill the victim—yet they did not take that rather easy opportunity. You either shoot someone or you don't. You either stab someone in a place likely to cause death or you don't. And in those cases, the defendants made a choice not to commit those fatal acts.

¶ 45    Suffocation is different. Choking someone with one's hands is a continuous act with an indeterminate point at which death may occur. Whether the assailant completely blocks the airway or only partially does so, how long the victim can survive without oxygen—it is impossible to be certain when death will result. And we know from the victim's testimony that she was on the verge of death—or at least blackout—twice. So unlike the irreversible decision to shoot someone, for example, intending to kill someone by choking is reversible—one can intend to suffocate someone but then later change one's mind before it's too late. The trial court, considering all the evidence, found that defendant did, in fact, intend to kill Rivera at some point in time while he waffled between rage and restraint, though he obviously later retreated from that decision.

¶ 46    So those cases, in our view, do not require us to overturn the conviction. A rational trier of fact could have convicted defendant of attempt murder. We affirm the conviction.

¶ 47    Defendant next contends that his eight-year sentence is excessive. A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Sentencing decisions are entitled to great deference on appeal because the trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, including

the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 48    In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute its judgment for that of the trial court merely because it would have weighed these factors differently. *People* v. *Busse*, 2016 IL App (1st) 142941, ¶ 20. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the permissible statutory range may be deemed an abuse of discretion only when they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 49    Here, the trial court did not abuse its discretion in sentencing defendant to eight years' imprisonment. Defendant was convicted of attempted first-degree murder, a Class-X offense with a sentencing range of 6 to 30 years. 720 ILCS 5/8-4(c)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Because the eight-year sentence imposed in this case was within the statutory sentencing range, it is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 50    Defendant does not dispute that his sentence fell within the permissible sentencing range and is presumed proper. Rather, he argues that his sentence is excessive in light of the nature of the offense, his complete lack of criminal history, and his significant rehabilitative potential.

¶ 51 As evidence of rehabilitative potential, defendant highlights that he has close family ties; has a consistent and substantial work history; obtained his G.E.D. after moving to the country by himself at 17; provided financial support to his mother, Rivera, and Rivera's daughter; and rejected Rivera's entreaties to move to Texas with her and hide out while the case died down, opting instead to continue to work to support his family. Defendant also argues that he showed remorse at sentencing when he explained he had made a mistake during a moment of great anger and stress and asked for forgiveness from Rivera's family and God. Noting his statement at sentencing that the incident had "caused a big change in [his] life," defendant asserts that his "expressed desire to change, and his ability to change with family support, show a strong likelihood that he can be restored to useful citizenship."

¶ 52 The record shows that the trial court was well aware of the mitigating factors identified by defendant on appeal. Almost all of these mitigating factors—defendant's lack of a criminal background, his family ties, work history, education, and provision of financial support to his mother—were included in the PSI report, which the trial court stated it had reviewed prior to imposing sentence. In addition, defense counsel highlighted defendant's financial support of Rivera and her daughter, as well as defendant's decision to continue to work after the incident rather than flee to Texas with Rivera. Finally, in announcing sentence the trial court expressly noted that it considered these factors and defendant's remorse, stating it was giving defendant "a little credit" for accepting responsibility at sentencing, even though he had placed blame for the incident on Rivera during his trial testimony.

¶ 53 However, the court also made clear at sentencing that it was disturbed by the factual circumstances of the case. The court observed that Rivera had endured a "uniquely aggravated,

extended ordeal" that lasted 30 to 45 minutes and was of a "somewhat sadistic nature" and found it aggravating that defendant not only strangled Rivera, but also repeatedly told her she was going to die. The court stated, "[R]arely in my experience *** do you see somebody continue on and sort of almost terrorize the person by telling them what their fate is, almost to the point of enjoying it. Those aspects of his case, I think, are appropriate to consider in aggravation." The most important sentencing factor is the seriousness of the offense, and a trial court need not give greater weight to a defendant's rehabilitative potential or other mitigating factors than to the severity of the offense. *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 82.

¶ 54    Given that all of the mitigating factors defendant raises on appeal were discussed in defendant's PSI report or in arguments in mitigation, defendant essentially asks us to reweigh the sentencing factors and substitute our judgment for that of the trial court. As noted above, this we cannot do. See *Busse*, 2016 IL App (1st) 142941, ¶ 20 (reviewing court must not substitute its judgment for that of trial court merely because it would have weighed these factors differently). In light of the facts of this case, the interests of society, and the trial court's stated consideration of mitigating and aggravating factors, we cannot find that defendant's sentence—a term two years above the statutory minimum—is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. We thus find no abuse of discretion.

¶ 55    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 56    Affirmed.