**People, of the State of Illinois, Plaintiff-Appellee, v. Charles Lee Thomas, Defendant-Appellant.**

**Gen. No. 51,955.**

First District, Fourth Division.

July 31, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago, for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSES CHARGED

Rape. Ill Rev Stats 1965, c 38, § 11–1.

Aggravated battery. Ill Rev Stats 1965, c 38, § 12–4.

Attempt (murder). Ill Rev Stats 1965, c 38, §§ 8–4, 9–1.

Robbery. Ill Rev Stats 1965, c 38, § 18–1.

JUDGMENT

After a bench trial, defendant was found guilty on all charges and sentenced to concurrent terms of 50 to 75 years for rape, 9 to 10 years for aggravated battery, 19 to 20 years for attempted murder, and 19 to 20 years for robbery.

CONTENTIONS RAISED ON APPEAL

1. Alibi evidence, coupled with prejudicial identification testimony, raises a reasonable doubt of defendant's guilt.

2. Defendant was prejudiced by an improper identification procedure.

EVIDENCE

Anna B. Smith, for the State:

On February 23, 1966, at approximately 12:15 p. m., she and her three young children were in the dining room of their apartment at 1931 South Homan Avenue watching television. She looked up, while nursing the baby, and saw a man she identified as defendant standing in the doorway leading from the living room. Holding a knife, he told her to "shut up" and that he would kill her.

She told him to take what he wanted and leave, but he lunged for her, causing her to release the baby. He then banged her head against a chest of drawers, again saying, "Shut up. I will kill you." As her two young sons left the room, one said, "Leave my mama alone," whereupon defendant swung at him with the knife. Defendant then began hitting the witness in the head and picking at her face with his knife, and continued to say, "Shut up. I will kill you." He asked if she had a gun or any money, but she replied that she didn't.

He forced her into the bedroom, started to rip off her clothing, and made her strip and lie on the bed. He then forced her to remove her pants, tore off her top clothing, and said, "Keep your eyes closed or I will pick them out." He stuck her in the shoulder with the knife before unzipping his pants and raping her. During the rape, he tried to cover her face with her robe top, but she kept pushing it away because she was smothering. After he had finished the act, he cleaned himself and ransacked the dresser, taking a dollar and some change. He said that he wanted to kill her and that he would see her again. When defendant had left, she ran to the phone, but defendant had cut the cord, so she hurried to the back and front doors to "holler" for help. A neighbor, Mrs. Berry, from an apartment on the floor below, immediately came upstairs to help. Witness received cuts on several fingers, the right shoulder, her left side, her stomach, and was slashed and scraped all over her face.

Witness stated that defendant was wearing dark clothing, dark pants, a dark necktie, and a "flowered blue," white or light shirt. He had on a dark trench coat with a dark blazer underneath. The trench coat was an all-weather one with a plaid design on it. She told Officer Cangelosi, who arrived on the scene shortly after the attack, that the man might have been wearing a pink shirt. She never said that the shirt was light red. She did tell

447

him that he was wearing a charcoal gray coat. Defendant had a hat on, but she couldn't "remember it," although she may have told the officer it was charcoal gray.

The description of the assailant which she gave to Officer Cangelosi was of a male Negro in his twenties, 5' 8" to 5' 10" tall, and weighing about 190 to 200 pounds. Defendant had black skin and an unkempt mustache, meaning that there were ragged, unshaved hairs growing across the lip. She was "absolutely certain" that defendant is the man who attacked her, as she was able to observe him during the entire episode, except for the periods of time during the rape when he covered her face.

While she was recuperating in the hospital, Officer King showed her a book full of photographs from which she picked one out. The next day, the officer brought defendant to the hospital and she identified him as her rapist.

Sandra Berry, for the State:

She lives in the apartment immediately under the victim's. At approximately 1:00 p. m., on the day in question, she heard a pounding on her ceiling and ran upstairs, where the victim told her she had been raped. She noticed that clothing in the bedroom was strewn all over the floor and that blood covered everything.

Erma Tyus, for the State:

She lives at 1935 South Homan, which is a separate wing of the victim's building. On February 23, 1966, at approximately 1:00 p. m., she had occasion to leave her apartment and proceed toward the entrance to 1931 South Homan, which is across the courtway. She saw a man leaving the 1933 entrance. He was wearing a hat, gray car coat, and dark trousers, and passed within a foot or two of the witness. When he reached the sidewalk, he turned and went into the 1935 entrance. She followed him into the entrance, went to her apartment and called the police. A week later, after she had given the man's description to the police, an officer showed her a picture

of defendant which she identified as being of the man she had seen that day.

The description she had given to the police was that of a man between 25 and 30 years of age, between 5′ 7″ and 5′ 9″ tall, and weighing 160 to 175 pounds. She didn't notice if he had a mustache, but he did have "rough type" skin.

Patrick King, for the State:

He is a police officer and, on February 25, 1966, visited the victim at Mt. Sinai Hospital. He showed her some photographs of men and she identified one as the man who had raped her. The next day he took defendant, who had been arrested, to the hospital. When the victim saw him, she said, "That is the man. Get him out of here," and became hysterical and started to cry.

James Griffin, for the State:

He placed defendant under arrest. Defendant said it was a "bum rap."

It was stipulated that defendant is 25 years of age, 5′ 5″ tall, and weighs 154 pounds. The trial judge stated for the record that defendant is comparatively dark-skinned and is of stocky build. The judge also indicated that, from his vantage point in the courtroom, it was difficult to say whether or not defendant was wearing a mustache.

Dorothy Johnson, for the defense:

She is a first cousin of defendant and, on the day in question, saw him about 9:00 a. m. at her home, which is located at 19 North Ada Street. At 11:00 a. m., he left to pay a bondsman whose office is at 11th and Pulaski. He was wearing a bright red shirt, dark pants, and a sport coat. He also had on a hat and a tweed overcoat. Defendant did not have a mustache or long hair on that day. She next saw him sometime between 1:20 p. m. and 2:00 p. m., but she talked to him on the telephone between 12:30 and 1:00. When he returned, his clothes were not disheveled, nor was there any blood on them.

Mary Young, for the defense:

She is defendant's aunt and he lives with her at 19 N. Ada Street. She testified to essentially the same facts as related by her daughter, Dorothy Johnson. In addition, she mentioned that defendant never wears a tie and that he shaves twice a week.

Henry Morris, for the defense:

He is defendant's uncle and picked him up for work on the day in question sometime between 4:00 and 4:30 p. m. Defendant did not have a mustache and is always clean-shaven.

Doris Drake, for the defense:

She is 15 years old and knew defendant prior to seeing him on February 23, 1966. She got on a Madison Street bus at Kedzie (3200 West) and sat down beside him. He said that he was going to pay some bills. He alighted from the bus at Pulaski and she thought it was about 12:10 p. m., because children were out of school. She saw defendant get on another bus at Pulaski. (Madison and Pulaski intersection is about three miles from the victim's home.) She didn't notice what defendant was wearing.

Arthur Cabot, for the defense:

He is president of Prevue Metal Products, where defendant was employed until February 26, 1966. He produced a time card showing that defendant appeared for work at 5:00 p. m. on February 23, and worked until 1:00 a. m. the following morning. He usually saw defendant at the beginning of the shift, but never saw him with a mustache.

Emil Delgado, for the defense:

He was a fellow employee of defendant's for two years. He stated that defendant never wore a mustache, nor did he ever recall seeing defendant unshaven.

Ronald Wozniak, for the defense:

He is a police officer and interviewed the victim on the day of the attack. She described her assailant as a male Negro, approximately 25 years of age, 5' 11" tall,

and weighing 210 pounds. She told him that he had a jet black complexion and an untrimmed mustache and was wearing a dark hat, dark grayish-black overcoat, navy blue pants, black shoes, blue shirt, light blue tie, and black leather gloves.

He questioned the victim at the hospital where she was being "sewn up." She was distraught and hysterical and didn't seem to be aware of anything.

Carl Cangelosi, for the defense:

He is a police officer and also interviewed the victim in the hospital on that day. The description she gave him was substantially similar to that given Officer Wozniak, but differed in the following respects: She stated that defendant was between 21 and 25 years of age, 5' 8" to 5' 10" tall, and weighed between 190–200 pounds. She also told him that he was wearing a pink or light red shirt.

He noticed that the victim was very upset and in a highly nervous state.

It was stipulated that Officer Sarafin interviewed Erma Tyus over the phone on February 23, 1966, and that she described the man whom she saw as being a male Negro, aged 25 to 35, weighing 175 to 200 pounds, 5' 7" to 5' 9" tall, dark-complected, with pockmarked face, heavy mustache, and untrimmed, long black hair. He was wearing a three-quarter car coat, brown hat, and dark trousers that were long and baggy.

Manuel Cooper, for the defense:

He produced in evidence a receipt dated February 23, 1966, made out to defendant from Lawrence Enterprises, located at 1103 South Pulaski. He couldn't identify the man whom he had given the receipt to, but noted that it must have been made out during his work hours, 9:00 a. m. to 4:00 p. m. and 6:00 to 8:30 p. m.

OPINION

Defendant argues that the instant conviction rests upon an identification which is doubtful, vague and un-

451

certain, and that it must be reversed, citing People v. Gardner, 35 Ill2d 564, 221 NE2d 232; People v. Cullotta, 32 Ill2d 502, 207 NE2d 444. It was stipulated that defendant's actual height is 5′ 5″ and that his weight is 154 pounds. The victim twice gave descriptions of her assailant to police at the hospital on the day of the attack. At first, she stated that his height was 5′ 11″ and weight was 210 pounds. She then told the second officer that his height was between 5′ 8″ and 5′ 10″ and weight between 190 and 200 pounds. Her description of his attire also differed, especially with regard to defendant's shirt, which she first stated was a "flowered blue," but then said that it was "light colored or white." She also mentioned that defendant wore an unkempt mustache, as if he hadn't shaved recently. Mrs. Tyus, on the other hand, stated at trial that if he wore a mustache she didn't notice it. However, a police report, introduced in evidence, that was allegedly phoned in by Mrs. Tyus on the day of the incident, contained reference to a heavy mustache and untrimmed, long black hair. She denied having given this description. She also testified that the man was 5′ 7″ to 5′ 9″ tall and weighed 175 to 200 pounds.

In spite of these differences in the evidence describing defendant, both witnesses identified him as the man they had seen that day. The victim, several days after the incident, picked the defendant's picture out of a group of photographs and subsequently identified him at a showup in the hospital. Her identification was positive and certain. Her failure to be completely consistent in describing her assailant to police is understandable and may be adequately explained by the many wounds she had received and the near hysterical state she was in at the hospital. Both officers testified that she was distraught and extremely upset when they questioned her. Mrs. Tyus, whose description of defendant's physical characteristics closely resembles his actual appearance, positively identified defendant from his photograph and at trial. Her

452

testimony adds strong, independent corroboration to the victim's identification.

The principal discrepancy in descriptions is whether or not the rapist did or did not have a mustache. The defense witnesses testified that he never wore a mustache, but, in so stating, his aunt, with whom defendant lived, said that defendant shaved twice a week. The trial judge, in the comparatively good light of the courtroom, and from a reasonably short distance, was unable to discern whether or not defendant was wearing a mustache. The same may be said of this court's examination of defendant's photograph in evidence. Because of the configuration of the upper lip, it is easy to confuse the lip line with a thin mustache.

■ The consideration of contradictory testimony and determination of credibility of witnesses and the weight to be accorded their evidence are matters for the trier of fact. People v. Coulson, 13 Ill2d 290, 149 NE2d 96; People v. Davis, 126 Ill App2d 255, 261 NE2d 771. Upon a review of the record, we find sufficient evidence, including identification testimony, to establish defendant's guilt beyond a reasonable doubt.

■ Defendant argues that evidence of an alibi, when coupled with the uncertain identification testimony, raises a reasonable doubt of his guilt. The alibi evidence was supplied primarily by members of defendant's family, who stated that he left home on the day in question at 11:00 a. m. and returned between 1:30 and 2:00 p. m. This fails to account for defendant's whereabouts during the commission of the crime, as does the testimony of defendant's employer. Doris Drake, age 15, was the only witness who testified to seeing defendant during the crucial time period that day. Her testimony is considerably weakened by the fact that, without any prior contact, she was asked to testify the day before the trial began. The trial judge, as trier of fact and whose province it is to assess credibility, rejected defendant's alibi. There

was, in our opinion, sufficient evidence in the record to establish defendant's guilt beyond a reasonable doubt, and we see no reason to disturb that decision.

Defendant also. contends that the identification procedures utilized by the police were unfairly suggestive and conducive to irreparable mistaken identification, citing Stovall v. Denno, 388 US 293. The challenged circumstances in the instant case are: (1) that the victim viewed a group of photographs while in the hospital and selected defendant's; (2) that police brought defendant to the hospital the next day and explained to the victim that they had the man whose photograph she had identified; and (3) that she then affirmed her photographic identification and later identified defendant at trial.

We are firmly convinced that the utilization of a group of photographs, as in the instant case, to isolate a suspect or series of suspects is proper in a police investigation of an alleged crime. There has been no allegation by defendant, nor does any basis appear in the record, which indicates that this identification process prejudiced defendant. See Simmons v. United States, 390 US 377, 384; People v. Williams, 117 Ill App2d 34, 254 NE2d 81.

The gravamen of defendant's complaint is directed to the tactic of displaying him singly to the victim after she had been told that he was the man whose photograph she had picked out. Under the circumstances, we do not find this to have been an improper procedure, but even if the showup at the hospital were considered unnecessarily suggestive (Stovall, supra; Palmer v. Peyton, 359 F2d 199), the victim's in-court identification will, nevertheless, be admissible if it is shown, by clear and convincing evidence, that it had an independent origin, arising from an earlier uninfluenced observation of defendant. See People v. Blumenshine, 42 Ill2d 508, 250 NE2d 152; People v. Cook, 113 Ill App2d 231, 252 NE2d 29. Here, the victim was being attacked by defendant for about 45 minutes and, in spite of the fact that defendant

454

attempted to cover her face during part of the incident, she had a more than adequate opportunity to observe him closely. We find that these facts disclose the prior uninfluenced observation which constituted a sufficiently independent origin to support her in-court identification. See People v. Cook, supra.

 Although not briefed on this issue, we feel constrained to address ourselves to the matter of sentencing. Defendant received separate sentences for attempted murder, rape, aggravated battery, and robbery. We believe a question exists as to whether two of the offenses charged (attempt (murder) and aggravated battery) resulted from the same conduct. If so, defendant may not be sentenced on more than one, either concurrently or consecutively. SHA, c 38, § 1–7(m), Committee Comments, p 32. "Conduct" is defined as "an act or a series of acts, and the accompanying mental state." Ill Rev Stats 1967, c 38, § 2–4.

 The evidence shows that defendant wielded a knife which he repeatedly used to inflict multiple wounds upon the victim, and that he also beat her head against a chest of drawers. He then raped the victim, robbed her, and fled. Defendant's utilization of his knife constituted a continuing use of force far more than was necessary to require the victim's submission to rape and robbery. It demonstrated a sadistic intention to inflict physical injury upon the victim which was "independently motivated or otherwise separable from" (People v. Stewart, 45 Ill2d 310, 313, 259 NE2d 24) the rape and robbery, and was thus sufficient to constitute a separate offense. We do not believe, however, that the record supports convictions for both attempted murder and aggravated battery. See People v. Baker, 114 Ill App2d 450, 252 NE2d 693. While ordinarily this circumstance would result in affirmance of the conviction for the greater of the two offenses (in this case, attempted murder) and reversal of the other (People v. Stewart, supra), we do not

reach that conclusion in this case. There is no question that there was adequate proof to establish the necessary mental state for aggravated battery. We believe, however, that the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime. We, therefore, reverse defendant's conviction for attempted murder and affirm the other three convictions. In doing so, we permit to stand sentences for 9 to 10 years and 19 to 20 years, which, singly, would, in our opinion, be improper sentences. The small spread between minimum and maximum forecloses any effective function of the Parole Board and tends to remove all incentive to the defendant to be a good prisoner. In view of defendant's concurrent sentence of 50 to 75 years for rape, however, which we consider appropriate in this case, the narrowness of the spread in the other sentences becomes largely academic.

The judgment on the charge of attempt (murder) is reversed, and the judgments with respect to the offenses of rape, robbery, and aggravated battery are affirmed.

Affirmed in part and reversed in part.

DRUCKER and LEIGHTON, JJ., concur.