NOTICE

Decision filed 05/02/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190416-U

NO. 5-19-0416

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-2336 |
| | ) | |
| ARTHUR E. SMALLWOOD, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State presented sufficient evidence to prove defendant's intent to kill, and its closing arguments did not result in prejudice necessary to find plain error or ineffective assistance of counsel. Trial counsel was not ineffective for failing to highlight certain medical records that were admitted into evidence. The trial court's *Krankel* determination was manifestly erroneous as defendant presented a colorable claim of ineffectiveness.

¶ 2    Defendant appeals from his conviction of attempted murder. On appeal, he asserts (1) the evidence was insufficient to prove an intent to kill, (2) the State's improper closing arguments constituted plain error and ineffective assistance of counsel, (3) counsel was ineffective for failing to highlight the medical records admitted into evidence, and (4) the trial court erred in finding defendant's *pro se* posttrial ineffective assistance of counsel claim did not rise to the level that

1

requires further action. For the reasons below, we affirm the conviction but reverse and remand on the trial court's *Krankel* determination.

¶ 3                                    I. BACKGROUND

¶ 4     On August 9, 2018, defendant was charged—by indictment—with attempted first degree murder for stabbing Jon-Eric Andersson over 12 times in the back, shoulder, and neck, in violation of sections 8-4(a) and 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)) (count I), and—based on the same actions—aggravated battery, in violation of section 12-3.05(a)(1) of the Code (*id.* § 12-3.05(a)(1)) (count II). Before jury selection, the trial court granted the State's motion to dismiss count II and proceed only on count I.

¶ 5     At trial, Jon-Eric Andersson testified that he drove cabs for Alton's Best Cabs (ABC) for 7½ years and was working on August 8, 2018. Around 9:30 p.m. that night, ABC dispatched Andersson to Bubby & Sissy's, a bar located at 602 Belle in Alton, Illinois, for a pickup. He averred that it was common for bar patrons or people at the bus station across the street to ask the bar workers to call them a cab.

¶ 6     When Andersson arrived, he waited for about two minutes and the passenger opened the door and sat in the rear passenger seat. The passenger stated he needed to go to 1209 Atwood in Alton. Andersson was familiar with the address, as he had calls to that address before. The drive was about a mile and a half and took about three or four minutes.

¶ 7     After Andersson parked in front of the address, the passenger slid across the seat and—with his left arm—grabbed Andersson around his neck from behind. Andersson immediately grabbed the passenger's arm with his hand and pushed it away, but the passenger began to hit him. At first, Andersson thought the passenger was punching him but when Andersson reached up to try to grab the passenger, his hand grabbed a knife blade. At that point, he realized he was being

2

stabbed in his neck, shoulder, arm, and upper back. During this time, Andersson heard the passenger say, "don't do anything" or "don't move." But Andersson averred that he reacted before registering what the passenger said.

¶ 8 Once he realized he was stabbed, Andersson thought the passenger was trying to kill him. In response to the attack, Andersson pressed the gas pedal to the floor then the brake and swerved to try to shake the passenger off. The passenger yelled "let me out of this cab." Andersson slowed down and the passenger exited the car before Andersson could stop. Andersson then radioed dispatch to say he had been stabbed and was headed to the hospital.

¶ 9 Andersson drove himself to the Alton Memorial Hospital. He thought he was stabbed about 20 times, but the hospital told him that he had 18 wounds. Andersson believed he received 50 stiches but lost count. The hospital transferred him to Barnes-Jewish Hospital in St. Louis, Missouri. The State admitted photos of Andersson's wounds from that night. Andersson averred he still experienced numbing in his shoulder, itching, burning, and had permanent scarring.

¶ 10 Andersson testified that he did not get a good look at the passenger and could not identify the passenger in court with 100% confidence. He could, however, tell the passenger was male in his 40s or early 50s with some sort of plastic bag. Although Andersson had $80 on his person that night, the passenger did not take anything.

¶ 11 On cross-examination, defense counsel questioned Andersson about his statement to the officer who interviewed him that night. Andersson testified he told the officer that when the passenger slid behind him and put him in a chokehold, the passenger said, "don't do nothing, don't move, words to that effect." He also told the officer that he believed he was going to be robbed. Counsel then asked if Andersson told the officer that the passenger began striking Andersson after Andersson began driving fast. Andersson denied telling the officer that and said, "He had already

3

—he was already doing that." He clarified he told the officer that he was trying to escape from being assaulted with a knife, and that the passenger was already stabbing him when he began driving erratically. Counsel asked, "Well, did you tell the officer that you believed your best chance not to be injured was to begin driving fast?" Andersson did not believe he used those words. Andersson also identified—in the photo of his cab that night—a ball cap in the back seat. The ball cap was not Andersson's, and he did know from where it came.

¶ 12    Brian Froelke, an emergency room doctor from Barnes-Jewish Hospital, also testified. He identified August 9 and 10, 2018, medical records for Andersson, which were admitted. Dr. Froelke testified that Andersson was transferred from an outside hospital to Barnes-Jewish Hospital with a report of multiple stab wounds as a level one trauma. He stated that Andersson was a level one trauma risk category due to the stab wounds to his torso, head, and neck region. Dr. Froelke explained that "stab wounds to those areas can be life threatening because of the number of—the number of structural threats in that particular area," such as arteries, blood vessels, and nerves. There was some indication of potential bleeding and Dr. Froelke wanted to make sure the bleeding did not expand or cause problems with Andersson's lungs. Accordingly, Andersson required additional imaging, including CT scans, to evaluate the injuries.

¶ 13    Timothy Barks, a dispatcher for ABC, testified that on August 8, 2018, a bartender from Bubby & Sissy's requested a cab. Barks could not remember the exact address but knew the destination's street name was Atwood. He sent Andersson to Bubby & Sissy's to complete the request. Within roughly five minutes of dispatching Andersson to Bubby & Sissy's, Barks received a call from a panicked Andersson who said, "something about robbed, being stabbed." Andersson also said that he was headed to Alton Memorial Hospital. Immediately after that call, Barks called 9-1-1. The State submitted the 9-1-1 call.

4

¶ 14    Officer Matthew Tranter testified next. He was dispatched around 10:15 p.m. to Alton Memorial Hospital the evening of the stabbing. Officer Tranter made contact with Andersson and took pictures of his injuries and cab. He collected a ball cap from the back seat of the cab and several blood swabs. Officer Tranter was unable to locate any latent fingerprints. After the officer conducted a lawman inquiry, to determine whether the police have had previous contact with the house, who resides at the house, and the previous residents, he discovered Gene Williams resided at the residence.

¶ 15    Officer Tranter clarified what Andersson told him that night. Andersson stated that the passenger grabbed Andersson by the neck, placing him in a chokehold, and said "don't do nothing." At that time, Andersson thought he was going to be robbed and that his best chance at preventing the robbery would be to drive fast. Andersson told the officer after he began accelerating, the passenger began stabbing him, although Andersson first thought the passenger was punching him. The passenger said to stop the cab, Andersson did, and the passenger exited the cab.

¶ 16    The officer obtained a photograph from Bubby & Sissy's video surveillance that displayed an individual wearing a ball cap. Officer Tranter testified that the ball cap in the photograph was similar to the one found in the cab. After seizing the ball cap from the back seat, the officer packaged it into an evidence bag and secured it in an evidence locker at the Alton Police Department.

¶ 17    Through the testimony of Charles Hinkle, manager of ABC, the State submitted a Facebook message sent to ABC's Facebook account on August 8, 2018, from a profile with the name Dawton Smallwood. The message asked how much a cab would be from West 9th Street to Atwood in Alton, IL. Hinkle recognized the person in Dawton Smallwood's Facebook profile picture as

defendant. Hinkle knew defendant because he had been friendly with one of the drivers from ABC and came to the ABC office.

¶ 18    The State also called Dwight Chavours, the owner of the house located at 1209 Atwood Street, to testify. The residence on Atwood Street was one of Chavours's rental properties. He testified that on August 8, 2018, no one lived at the residence. Chavours stated that he knew defendant since they were kids, and defendant helped Chavours repair his rental properties, including the Atwood residence. Chavours believed defendant helped him with the Atwood residence a few times, most recently being three or four days before this incident.

¶ 19    The State next called Gene Williams. Williams stated that he worked for defendant's mother and knew defendant for a few years. Williams was familiar with the Atwood residence because he worked for Chavours and stayed at the residence while working on it. Williams saw defendant at the Atwood residence about a month or two before this incident.

¶ 20    Detective Andrew Pierson testified next. Detective Pierson was contacted to assist with the investigation after Andersson arrived at Alton Memorial Hospital. His investigation led him to Bubby & Sissy's, where he obtained the bar's surveillance video. Detective Pierson testified that one camera displayed the front entrance while the second camera oversaw the general bar area. The State admitted the videos. The detective testified that the relevant part of the videos showed an individual—who was wearing a hat and red shirt while carrying a white plastic bag—walking inside the bar. The individual then approached the bar and the bartender then reached for a portable phone as the individual walked back outside. When the individual was outside, the bartender briefly came out, interacted with him, and went back inside the bar. The video then displayed the individual getting into a cab and the vehicle driving away. Detective Pierson testified the same cab

6

was located at Alton Memorial Hospital later that night. He also believed the ball cap on the individual in the video was similar to the ball cap found in the cab.

¶ 21   Detective Pierson also verified that ABC had a Facebook page. After looking into Hinkle's information and at ABC's Facebook page, Detective Pierson discovered the individual who sent the message to ABC on August 8, 2018, was a Facebook page displaying the name Dawton Smallwood. Detective Pierson accessed the profile picture and cover picture for the Dawton Smallwood Facebook page. Detective Pierson testified that people do not always use their given names for their Facebook pages. It was common for people to use nicknames. The detective averred that Dawton Smallwood was a nickname associated with defendant. After his investigation of ABC's Facebook page, Detective Pierson was interested in contacting defendant. He accessed July 27, 2018, court records in which defendant provided an address of 1116 1/2 West 9th Street, Alton, Illinois.

¶ 22   Jason Brooks, a bartender at Bubby & Sissy's, also testified for the State. He averred that on August 8, 2018, a man came into the bar and asked for a cab to take him to Atwood Street. Brooks testified that the man was an African American in his 40s or 50s who was wearing a red shirt. Brooks called ABC and the man went outside. After Brooks hung up with ABC, he went outside to tell the man the price of the cab ride and that it would take the cab 20 or 30 minutes to arrive. Brooks identified the man who requested the cab on the surveillance video as defendant.

¶ 23   On cross-examination, Brooks testified that he was still working that night when police contacted him. About an hour or two later, the police showed him a photo line-up. Brooks acknowledged that—at that time—he made an identification but was only 70% or 80% certain that he was correct. Counsel then asked "[w]ithin an hour or so you are 70 to 80 percent certain and now we're almost a year later," and "[defendant is] the only African American sitting at my

7

counsel table; is that correct?" Brooks answered affirmatively to both questions. On redirect, Brooks stated—with 100% certainty—that defendant was the man who requested a cab on August 8, 2018.

¶ 24     The defense called a single witness, Detective Michael Roderfeld. Detective Roderfeld averred that he is the evidence officer for the Alton Police Department. A day or two after Officer Tranter placed the evidence bag with the ball cap and bandanna in the evidence locker, Detective Roderfeld relocated the evidence bag to the lab ready shelf in the evidence vault. He testified that the bag never went to the lab. The defense admitted the bag and ball cap, as defense's exhibits 1 and 2 respectively.

¶ 25     The defense rested, and the court excused the jury. The court then allowed the defense to make record of its motion for a directed verdict that was argued during a side bar after the State rested its case. Defense counsel argued the State failed to establish the intent to kill. The State responded that stabbing Andersson in excess of 15 times and the location of the wounds was sufficient to establish intent. The court reiterated its decision to deny the motion for directed verdict.

¶ 26     Before closing arguments, the court stated:

> "Closing arguments are not evidence. It is the attorneys arguing to you what they believe the facts were in this case and how those facts relate to the law. They are allowed to make reasonable inferences based on the evidence. So the attorneys are going to argue to you that information."

¶ 27     The State began its argument by stating:

> "One, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, up to 20 stab wounds. Not much for theatrics, but really think about that. 15 to

8

18 stab wounds in that man's neck, shoulder, and chest. One stab wound is horrific. Two stab wounds, three stab wounds, that's traumatic. 15, 16, 17, 18 stab wounds, that, ladies and gentlemen, is intent to kill. ***

* * *

*** It does not matter if his intent was just to rob him and get out with the cab driver's money. When he was stabbing him, maybe not even the first time or the second time or the third time, but how about the 11th time, the 12th time, the 13th, or maybe the 15th time, at that point he's doing so with the intent to kill that individual. No question."

It asserted defendant concealed his identity by having Brooks call ABC and had a plan by having a weapon with him.

¶ 28 The State contended that defendant performed a substantial step towards killing Andersson due to the

"15 to 18 stab wounds in the neck and in the chest of this individual is a substantial step towards killing the individual. And we know that because Dr. Froelke from Barnes Jewish Hospital and Washington University came in here and he told you. When you have stab wounds to this sensitive area, you have all kinds of risk. Some of which actually occurred with Mr. Andersson. You risk nicking arteries, blood vessels, lung punctures, nerve bundles, and all kinds of other internal bleeding issues. And he told you that Mr. Andersson actually had signs of internal bleeding and they had to keep him for observation. ***

* * *

9

Dr. Froelke again testified that these were trauma 1 level injuries. That he had a significant concern about the life of Mr. Andersson following these injuries. That there was some injury to his lung that he had to be observed for and possible internal bleeding."

¶ 29 Regarding identification, the State argued that Brooks identified defendant as the person who got into Andersson's cab and ultimately stabbed him. It also noted that defendant's own Facebook page asked ABC—on the same date of this incident—what cab fare would be from his residence to the Atwood address.

¶ 30 In the defense's closing, counsel pointed out that the State misstated that there were 15 to 18 wounds in the neck. He corrected the State by saying there was one in the neck, a bunch in the shoulder, and some in the chest.

¶ 31 Counsel argued the State failed to prove intent because the evidence showed that the intent was to get out of the cab because Andersson was driving erratically. He called into question Andersson's story, noting that originally Andersson believed he was going to be robbed and started to drive erratically before the passenger began to stab him. Counsel also noted that the passenger exited the car as soon as Andersson slowed down. He concluded:

"What whoever was in that cab wanted at that point was just to get out. Wasn't wanting to kill the individual. ***

* * *

*** That's no suggestion, even though you have a bunch of cuts, bunch of stabs, whatever you want to call them, that the intention of what was going on was to kill him. Anything but. It was to get out of that cab. ***

* * *

10

And the fact that there is one stab, two stabs, 27 stabs, that doesn't establish an intent, especially, especially when the person is saying, stop, let me out."

¶ 32    In addressing the Facebook message, counsel argued that the message did not mean defendant planned on doing "some bad things." He stated that the jury should use their common sense and consider whether there would be a reason for defendant to inquire about how much a cab cost if he was planning to lure the cab somewhere so he could either murder or rob the cab driver.

¶ 33    Defense counsel also challenged Brooks's identification, stating that immediately after he encountered the passenger, Brooks was 70% sure that the passenger was defendant. Therefore, it was unbelievable that a year later he could be 100% certain it was defendant. Counsel further contended that police found a ball cap that could have easily been tested for DNA but was not.

¶ 34    During the State's rebuttal, it noted that it made no sense that defendant had to stab Andersson 17 times to get out of the cab. It noted that there was no evidence that defendant "tapped him on the shoulder, [and] asked to get out before he started stabbing him." The State contended regardless of what Andersson told officers that night, he was definitive in his testimony that he pressed on the gas pedal because defendant stabbed him. Regarding Brooks's identification, the State contended that Brooks identified defendant twice, once on the date of the incident and now. It argued the defense spoke of DNA testing to distract the jury from the rest of the evidence that provided solid identification.

¶ 35    In providing the jury with instructions, the court stated:

"Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence.

11

Neither opening statements nor closing arguments are evidence. And any

argument or statement made by the attorneys which is not based on the evidence

should be

disregarded."

¶ 36    The jury found defendant guilty of attempted first degree murder. The court sentenced defendant to natural life imprisonment.

¶ 37    During the sentencing hearing, defendant made a statement in allocution. He stated that he was sorry for what happened to Andersson, and his heart went out to him. Defendant further stated that he wanted Andersson to know that the person responsible was Antonio Perkins—who was serving a 14-year sentence for harming another white male. Defendant claimed that Perkins used his tablet on August 8, 2018, to request the price for a cab ride, and that he previously broke into the Atwood address to steal a flat screen TV. Defendant contended that Perkins and he went to Bubby & Sissy's together, but Perkins went inside to have the bartender call for a cab while defendant waited outside on a parking block. After Perkins got into the back passenger side of the cab and left, defendant walked towards Ninth Street. Defendant stated he saw Charles Sanders drive past him as he walked home.

¶ 38    He further stated:

"I told my lawyer, Tyler Bateman, and I told his investigator Mr. Keagan Clutter

this whole story about Antonio R. Perkins. The investigator even contacted the

ABC Cab and was told that Antonio R. Perkins worked there. None of this ever

came out in trial. Why? Because my lawyer, Mr. Tyler Bateman, told me that it was

not relevant. This is why I attempted to get him off my case, but no one would

listen. *** Charles was contacted—Charles was contacted by Mr. Clutter, Mr.

12

Clutter [*sic*], and was asked, did you accompany Mr. Smallwood to Bubba [*sic*] and Sissy's. The answer to that would have been no. I told Charles I never asked [Mr. Clutter] to ask you that. I asked him to ask you did you see me walking home from Bubba [*sic*] and Sissy's. [Charles] said that he never did ask me that question, and the answer to that would have been yes. Antonio R. Perkins was also interviewed in the county jail by Mr. Keagan, and he told Mr. Keagan that he knew nothing about this crime, but he told Mr. Keagan that he used to work for ABC Cab company. *** First of all, I want the judge to know that I told Tyler J. Bateman the truth about this case. I told Tyler Bateman—I mean Tyler Bateman *** knew the name of the person who did this to Mr. Andersson. Tyler never called any of my witnesses to the stand. Katie Hurt, my roommate, would have told this Court that I was home when this occurred. Leon Smallwood, my brother, would have told the Court I was home the night this happened. When the police arrived at my mother's house at 909 Elliott Street in Alton, Illinois around 10:30, 10:35, I was phone messaged, Facetimed, by my brother, Leon Smallwood, and where he found me was in bed with my dog at the 1116 1/2 West Ninth Street in Alton, Illinois. Dwight Chavars [*sic*] would have told the Court that Antonio R. Perkins broke into his house at 1209 Atwood and stole his flat screen TV. Timothy Barks was never questioned about Antonio R. Perkins's employment status with ABC Cab and at what capacity did he leave the company. Gene Williams lied on the stand by saying he knows me because he does work for my mother. He never worked for my mother at any capacity. I told that to Tyler Bateman that he was lying, but he refused to cross-examine him. And last, but not least, Charles Sanders. He said he saw me

13

coming home, and he was on the CD leaving the club that night, and I saw him and he saw me going home. Charles Sanders was never called. I asked Tyler Bateman to call my witnesses, and he told me flat out he wasn't going to call any of my witnesses. *** Mr. Bateman was ineffective to me, and I feel that I did not get a fair trial."

¶ 39 The court acknowledged that defendant asserted an ineffective assistance of counsel claim and conducted a *Krankel* hearing. The court asked defendant if he had any other complaints regarding counsel. Defendant reiterated that he tried to get counsel to call his witnesses who were all willing to testify, cross-examine the State's witnesses, and get the ball cap tested for DNA. In response to defendant's claim, counsel stated,

"[Defendant] has told me a variety of things, and based on some things he told me I had my investigator interview certain people and made decisions based on that and also what the law is in terms of presenting so and so did it, who to call and who not to call. I don't know that I necessarily talked to everybody that he mentioned, because maybe what he told me wasn't going to be relevant one way or the other. But based on the evidence I did the investigation through my investigator I thought was appropriate. I think he indicated to you that we talked to Mr. Perkins who he seems to say did the case. And I think he indicated to you what Mr. Perkins told us, which probably was absolutely no reason for me to subpoena Mr. Perkins. A variety of other things I probably decided had no relevance as to whether or not he was the perpetrator. I tried the case in the fashion based on what he told me was the best fashion to try the case, not necessarily what would have been the best fashion to try the case, but based on what he told me at various times, I also should say that."

14

¶ 40    The court noted that counsel raised the issue of the ball cap not being tested for DNA. It further noted that counsel did a good job cross-examining the witnesses, highlighting that counsel brought out Brooks was only 70% to 80% sure defendant was the assailant on the night of the incident. Consequently, the court found that defendant's claims did not rise to the level that requires the court to take further action. Defendant timely appealed.

¶ 41                                    II. ANALYSIS

¶ 42                            A. Sufficiency of the Evidence

¶ 43    Defendant first argues the evidence was insufficient to prove an intent to kill. Specifically, he contends that Andersson's injuries and defendant's failure to take advantage of the opportunity to kill Andersson at the beginning or end of the struggle—at most—supports a finding that defendant responded to Andersson's reaction to an attempted robbery.

¶ 44    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const. amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364 (1970). It is not our function on review to retry defendant or substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we must determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 11. In doing so, we view the evidence and reasonable inferences thereof in the light most favorable to the State. *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 24. Although not conclusive or binding on this court, we give great deference to the trier of fact's determinations regarding the weight of the evidence and witness credibility. *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

15

¶ 45    These principles apply whether the evidence is direct or circumstantial. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *Vanhoose*, 2020 IL App (5th) 170247, ¶ 24. " 'The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Jackson*, 232 Ill. 2d at 281 (quoting *People v. Hall*, 194 Ill. 2d 305, 330 (2000)).

¶ 46    Here, the State needed to prove the essential elements of attempted first degree murder, which are (1) a substantial step toward the commission of killing an individual without lawful justification; (2) with the intent to kill. See 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018); *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 75. Intent is a state of mind that, if not admitted, is difficult to prove by direct evidence. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. As such, intent may be established by the circumstances, including character of the assault, use of a deadly weapon, and the nature and severity of the injury. *People v. Rolfe*, 353 Ill. App. 3d 1005, 1011-12 (2004). Because we presume a sane person intended the natural and probable consequences of his or her deliberate acts, intent may also be inferred from evidence that defendant willingly committed an act, the natural tendency of which is to destroy another's life. *Id.* at 1012.

¶ 47    On appeal, defendant cites *People v. Reynolds*, 2021 IL App (1st) 181227, ¶¶ 36, 41; *People v. Brown*, 2015 IL App (1st) 131873, ¶¶ 15-17; *People v. Thomas*, 127 Ill. App. 2d 444, 456 (1970); *People v. Garrett*, 216 Ill. App. 3d 348, 354 (1991); and *People v. Jones*, 184 Ill. App. 3d 412, 430 (1989), to argue that intent to kill cannot be found where—like this authority—he had the opportunity to inflict greater harm on Andersson and kill him if he used his weapon right away or when Andersson slowed the car down but did not.

¶ 48   In *Thomas*, defendant held a knife to the victim and threatened to kill her before forcing her into her bedroom to rape her. *Thomas*, 127 Ill. App. 2d at 446-47. He used the knife a few times to prick her body, struck her repeatedly, knocked her head against furniture, and stabbed her in the shoulder. *Id.* at 447. Defendant also threatened to kill the victim several times. *Id.* The victim suffered multiple cuts to her face and body. *Id.* The appellate court reversed defendant's attempted murder conviction because, while defendant "demonstrated a sadistic intention to inflict physical injury," it believed "the opportunity for murder was such that there was insufficient proof that defendant intended or attempted to commit that crime." *Id.* at 455-56.

¶ 49   In *Jones*, three defendants broke into Mr. and Mrs. L.'s apartment. *Jones*, 184 Ill. App. 3d at 415. Defendants hit Mr. L. several times in the head with a gun, repeatedly kicked him, and stomped on the back of his head. *Id.* at 430. Defendants also threatened to kill Mr. L. and his family. *Id.* Mr. L. suffered several lacerations and received 25 stiches and a broken nose. *Id.* The appellate court reversed defendants' attempted murder conviction with respect to Mr. L., finding the evidence was insufficient to establish intent to kill. *Id.* The court explained that while defendants possessed a gun and knife, the knife was not used on Mr. L., and defendants used the gun only to beat him. *Id.* It also relied on the fact that—although serious—Mr. L.'s injuries were not life-threatening. *Id.*

¶ 50   In *Garrett*, defendant and two accomplices attacked E.S. and V.S., after luring the victims to a housing complex. *Garrett*, 216 Ill. App. 3d at 350-51. One of the men held a knife to E.S.'s throat and threatened E.S. by saying " 'give me your money or I will kill you.' " *Id.* at 350. They also hit E.S. and kicked him in the face, which resulted in E.S. losing consciousness. *Id.* E.S. suffered lacerations to his skull and extremities, requiring 15 stiches to his lip, and lost two teeth. *Id.* at 351. The appellate court found the State failed to prove defendant had the intent to kill E.S.

17

*Id.* at 354. It reasoned that defendant was armed but did not use his weapon, and while E.S.'s injuries could have been life-threatening, he was treated on an outpatient basis. *Id.*

¶ 51    In *Brown*, defendant stabbed his girlfriend four times in the back after she told him to leave her apartment. *Brown*, 2015 IL App (1st) 131873, ¶¶ 3, 5. The victim only felt punching or pressure on her back at first, then saw blood and realized she was stabbed. *Id.* The victim ran out of the apartment and defendant did not chase after her. *Id.* There was no struggle before or after the attack. *Id.* ¶ 16. At trial, a doctor testified that "it was possible that 'the area in which Ms. Jones presented wounds could have resulted in her death,' " but the cuts on the victim were superficial. *Id.* ¶ 5. Considering all these circumstances, the First District reversed defendant's attempted first degree murder conviction, finding the State failed to prove intent to kill. *Id.* ¶ 16.

¶ 52    In *Reynolds*, defendant brutally attacked a woman, with whom he was romantically involved. *Reynolds*, 2021 IL App (1st) 181227, ¶ 1. Defendant choked her several times, always letting go before she passed out. *Id.* ¶ 8. He repeatedly hit her in the face with the blunt end of a box cutter, held the box cutter to her neck, and dug it into her skin, cutting her. *Id.* ¶¶ 7, 9. When the woman attempted to escape from defendant's truck, defendant grabbed her by her arm, dragged her down an alleyway, and eventually ran over her leg. *Id.* ¶ 12. Throughout this encounter, defendant accused the woman of cheating and threatened to kill the woman numerous times. *Id.* ¶¶ 7-12. The appellate court acknowledged that defendant violently assaulted the woman and threatened to kill her but found the character of the attack was more consistent with torture. *Id.* ¶ 41. It explained that while defendant possessed a deadly weapon, he did not use it in a deadly fashion, producing only superficial cuts with the box cutter, and he always stopped choking the woman after short periods of time. *Id.* The court further reasoned that although the injuries were extensive, they were not life-threatening. *Id.*

18

¶ 53    We find the instant case is distinguishable. The State presented evidence that once defendant placed himself in a position to attack Andersson by sliding over and putting his arm around Andersson's neck, Andersson immediately began to fight back, and a struggle ensued. The stabbing of Andersson was interrupted by his erratic driving, which scared defendant into fleeing the car once Andersson slowed down. These events took place in a matter of minutes. As such, unlike the above cases, we find there was not an opportunity to murder such that the character of the attack was sufficient to establish intent. See *People v. Sanders*, 168 Ill. App. 3d 295, 306-07 (1988). The fact that defendant left the car after stabbing Andersson 17 times does not change our reasoning, as a decision to abandon an attempt to kill after the elements are met is not a defense. *People v. Myers*, 85 Ill. 2d 281, 290 (1981); *People v. Grathler*, 368 Ill. App. 3d 802, 809 (2006).

¶ 54    Citing the same cases as his opportunity to kill argument, defendant also contends that Andersson's non-life-threatening injuries mitigate against an intent to kill. Defendant argues that, although Andersson's body was out of reach because he was sitting in the front seat, most wounds were to Andersson's right shoulder and back and not to more vulnerable areas such as his neck or face.

¶ 55    We first note, severity of the injury is but one consideration. In determining intent, a reviewing court must look to the entire circumstances. *People v. York*, 2020 IL App (2d) 160463, ¶ 18; *People v. Jefferson*, 227 Ill. App. 3d 491, 498 (1992). The decision in *Sanders*, 168 Ill. App. 3d 295, is instructive.

¶ 56    In *Sanders*, defendant and two accomplices attacked three men. *Id.* at 298-99. The two accomplices were armed with firearms. *Id.* at 298. Defendant tied and gagged the victims and stole money at his accomplice's direction. *Id.* After the accomplice brutally attacked one man, he directed defendant to kill one of the other men. *Id.* Defendant stabbed one victim, Kozak, in the

19

stomach and cut him on the head. *Id.* Defendant also hit Kozak in the head with a hammer. *Id.* As the accomplice urged defendant to shoot Kozak, another victim, Walkowiak, charged the assailants and ran from the room. *Id.* Defendant and his two accomplices then fled the apartment. *Id.*

¶ 57 Although Kozak's injuries were superficial, the appellate court affirmed defendant's attempted murder conviction, determining it was not a case where defendant had ample opportunity to murder but failed to do so. See *id.* at 306-07. It found the jury could reasonably conclude the evidence was sufficient to prove intent to kill where defendant's actions were interrupted by Walkowiak's charge. *Id.* at 307.

¶ 58 A review of the above cases demonstrates that courts have held superficial injuries were insufficient to prove intent where defendant(s) had ample, uninterrupted opportunity to kill and did not. See *id.* at 306-07. We find such opportunity was not present here where Andersson immediately began to fight back after defendant was in a position to attack. The ensuing struggle could also explain why stab wounds were found in Andersson's back despite being in the front seat of the car. Accordingly, despite defendant's evidence supporting a finding that the assailant's intent was to exit the car after a failed attempt to rob Andersson, we cannot say—viewing the evidence in the light most favorable to the State—that the evidence was insufficient to prove an intent to kill.

¶ 59                                    B. Medical Records

¶ 60 Defendant also asserts counsel was ineffective for failing to highlight favorable evidence in Andersson's medical records admitted at trial. Specifically, defendant notes the medical records included reference to: Andersson reporting that he was stabbed with a "box cutter type" knife; 17 "puncture like lacerations" observed on the upper right part of his body; Andersson suffering no respiratory distress; the initial plan was for Andersson to receive "regional woundcare at the

20

bedside" as long as internal injuries were ruled out; Andersson's injuries being "only superficial" once internal injuries were ruled out; Andersson receiving only 22 sutures on nine of the wounds, with no sutures required for the single laceration on his neck; and Andersson being discharged with an antibiotic within 12 hours of arriving at the hospital. According to defendant, this information provided important details about the nature of the incident and Andersson's injuries, and countered an inference that defendant acted with the intent to kill.

¶ 61 Defendant acknowledges the medical records were available for the jury's consideration. He argues, however, there is no indication in the record that the jury was made aware of this information, as the record is ambiguous as to whether the records were made available for the jury's review during its deliberation and counsel did not use other means to highlight the helpful parts of this evidence.

¶ 62 A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Defendants must overcome the strong presumption that counsel's conduct falls within the wide range of sound trial strategy. *Id.* The failure to establish either prong of *Strickland* precludes a finding of ineffectiveness. *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 63 The decision of what evidence to present has long been recognized as a matter of trial strategy. *People v. West*, 187 Ill. 2d 418, 432 (1999). Mistakes in trial strategy are generally insufficient to support a claim of ineffective assistance of counsel. *People v. Peterson*, 2017 IL 120331, ¶ 80. Accordingly, errors in trial strategy constitute ineffective assistance only if "counsel entirely fails to conduct any meaningful adversarial testing." (Internal quotation marks omitted.) *People v. Custer*, 2019 IL 123339, ¶ 39.

¶ 64 Here, counsel's strategy at trial was to argue that defendant was not the assailant and that whoever stabbed Andersson did so with the intent to stop Andersson's erratic driving. Medical records discussing the weapon and nature of Andersson's wounds are irrelevant regarding whether defendant was the man who stabbed Andersson. However, the weapon and severity of the victim's injuries are relevant to the issue of intent to kill. See *Rolfe*, 353 Ill. App. 3d at 1011-12.

¶ 65 Nevertheless, counsel did not focus on the weapon and severity of the victim's injuries to argue the assailant lacked the requisite intent. Instead, counsel's position at trial was that regardless of the number of stab wounds, the assailant only attacked Andersson because he was frightened by Andersson's erratic driving. He argued that Officer Tranter's testimony that Andersson originally claimed the assailant attacked him after he drove erratically proves that the intent of the assailant was to get out of the car, not to kill Andersson. The weapon used and severity of injuries would have provided little value in proving that point. The decision to rely on the timeline of the events to infer the assailant lacked the requisite intent, rather than focusing on the weapon and severity of Andersson's injuries, was a matter of trial strategy. "Although this strategy did not result in a favorable verdict, we must make every effort to eliminate 'the distorting effects of hindsight.' " *Peterson*, 2017 IL 120331, ¶ 88 (quoting *Strickland*, 466 U.S. at 689).

22

¶ 66    Defendant is entitled to only " 'competent, not perfect representation.' " *West*, 187 Ill. 2d at 432 (citing *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). Under these facts, we cannot say counsel's failure to bring attention to the weapon being a box cutter and that Andersson's injuries were ultimately superficial, constituted failure to conduct any meaningful adversarial testing. Consequently, defendant cannot claim ineffective assistance of counsel on this basis.

¶ 67                    C. Prosecutorial Misconduct During Closing Arguments

¶ 68    Defendant next contends the prosecutor made several incorrect statements during closing argument. Defendant acknowledges there was no objection to these statements. The issue is therefore forfeited.

¶ 69    Defendant invokes the plain error exception to the forfeiture rule. Normally, a court will only excuse forfeiture of errors concerning comments made at trial where the comments were "so inflammatory that the defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." *People v. Sims*, 192 Ill. 2d 592, 637 (2000); *People v. Kuntu*, 196 Ill. 2d 105, 129 (2001). "Absent reversible error, there can be no plain error." *People v. Johnson*, 208 Ill. 2d 53, 64 (2003); see *People v. Holmon*, 2019 IL App (5th) 160207, ¶ 53. " '[T]o determine whether a purported error is 'plain' requires a substantive look at it. But if, in the end, the error is found not to rise to the level of a plain error as contemplated by Rule 615(a), the procedural default must be honored.' " *Johnson*, 208 Ill. 2d at 64 (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)).

¶ 70    Prosecutors are permitted wide latitude in closing argument. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). They may comment upon the evidence and any reasonable inference thereof, even if unfavorable to defendant. *People v. Rush*, 294 Ill. App. 3d 334, 340 (1998). In reviewing allegations of prosecutorial misconduct in closing arguments, we must examine the State's and

23

defendant's closing arguments in their entirety and consider the complained-of comments in their proper context. *Id.*

¶ 71  Improper remarks warrant a new trial if they constitute a material factor in defendant's conviction. *Wheeler*, 226 Ill. 2d at 123. If we determine the remarks were not a material factor in the outcome of the trial, "defendant cannot meet his burden of demonstrating a reasonable probability of a different result." *Holmon*, 2019 IL App (5th) 160207, ¶ 53. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123.

¶ 72  Defendant first complains that the State led the jury astray when it argued that Dr. Froelke testified that he had significant concern about the life of Mr. Andersson following his injuries. While Dr. Froelke did not state that he had a significant concern about Andersson's life verbatim, he testified that Andersson was a level-one trauma, which is "the highest life-threatening risk category." Dr. Froelke also averred that the area in which Andersson was stabbed presented life-threatening risks. Accordingly, the State's comments were reasonable inferences from Dr. Froelke's testimony.

¶ 73  Defendant also argues that the State incorrectly stated that Andersson had "up to 20 stab wounds," and many or all the stab wounds were located in Andersson's neck and/or chest. On appeal, the State concedes that it misstated the evidence when it said the victim had "15 to 18 stab wounds in the neck and chest." However, we do not believe these misstatements were a material factor in the defendant's conviction.

¶ 74  While the State made a few misstatements regarding the evidence in its initial closing arguments, it correctly referred to the correct number of wounds several times and the correct

24

location of those wounds a few times. Defense counsel also notified the jury of the State's misstatement regarding the number of wounds in its argument and corrected the State by saying that "one up in the neck, a whole bunch in the shoulder area, and some in the chest." After the correction, the State referred to only the correct number of wounds, and made no misstatements, in its rebuttal. The court also instructed the jury before and after the arguments that closing arguments were not evidence and "any argument or statement made by the attorneys which is not based on the evidence should be disregarded." Generally, a court's instruction that closing arguments are not evidence cures resulting prejudice from any improper remarks by the prosecution. *People v. Howard*, 209 Ill. App. 3d 159, 182 (1991).

¶ 75    Further, the prosecutor stating that Andersson had 20 stab wounds rather than 17 had no impact on the defense's trial theories. In fact, when indicating the assailant's intent in stabbing Andersson was to get out of the car, counsel argued, "And the fact that there is one stab, two stabs, 27 stabs, that doesn't establish an intent, especially, especially when the person is saying, stop, let me out." The number of stab wounds also has no bearing on the issue of mistaken identity.

¶ 76    As such, while some of the State's comments constituted a misstatement of the evidence, the remarks were not a material factor in the jury's verdict (*Holmon*, 2019 IL App (5th) 160207, ¶ 53) and "not such a serious error that it inherently denied defendant a fair trial." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 217. We therefore find the State's closing statements do not constitute plain error.

¶ 77    Because we find the comments did not prejudice defendant, he cannot meet the second prong of *Strickland*. *Easley*, 192 Ill. 2d at 318. Therefore, we likewise reject defendant's argument that counsel was ineffective for failing to object to the State's improper closing arguments.

25

¶ 78                          D. *Krankel* Hearing

¶ 79    Defendant lastly argues that the court erred in finding that defendant's *pro se* posttrial

ineffective assistance claims did not warrant further action. *People v. Krankel*, 102 Ill. 2d 181

(1984), and its progeny created a common-law procedure that governs a defendant's *pro se*

posttrial claim of ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. The

applicable standard of review depends on whether defendant challenges the court's procedure in

conducting the *Krankel* hearing or its determination on the merits. *People v. Jackson*, 2020 IL

124112, ¶ 98. Because defendant challenges only the court's *Krankel* determination and not the

procedure, we will review only if the court's determination was manifestly erroneous. *Id.*

¶ 80    When a defendant raises an ineffective assistance of counsel claim sufficient to trigger a

*Krankel* hearing, new counsel is not automatically appointed. *People v. Jolly*, 2014 IL 117142,

¶ 29. Rather, the court first examines the factual basis underlying the claim. *Id.* "If the trial court

determines that the claim lacks merit or pertains only to matters of trial strategy, then the court

need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show

possible neglect of the case, new counsel should be appointed." *Jackson*, 2020 IL 124112, ¶ 97.

¶ 81    In conducting this evaluation, the trial court may inquire into the facts and circumstances

of the alleged ineffective assistance from counsel or defendant. *People v. Crutchfield*, 2015 IL App

(5th) 120371, ¶ 29. The court can base its determination on "its knowledge of the defense counsel's

performance at trial and the insufficiency of defendant's allegations on their face." *Id.*

¶ 82    Defendant contends trial counsel did not directly address his complaints related to an alibi

defense. Rather, counsel spoke in general terms about making decisions that he found appropriate

based on the evidence. Defendant argues that imaginably, trial counsel could have had valid

reasons for not interviewing each alibi witness and for not raising that defense or pursuing it at

trial. Based on the record that has been developed so far, however, there is no basis to definitively conclude that an alibi defense was somehow irrelevant or that trial counsel's decision to forego that defense and related investigation was an indisputably reasonable trial strategy. Counsel admitted that he (or his investigator) may not have spoken to everyone defendant mentioned. Accordingly, defendant contends he presented an arguable claim of ineffective assistance and the court erred in declining to appoint new counsel for further proceedings.

¶ 83 On appeal, the State argues that decisions on whether to call a witness or present an alibi are matters of trial strategy that cannot serve as the basis for a meritorious ineffective assistance of counsel claim. It further argues that even if the witnesses were called, their testimonies would not likely have changed the outcome at trial. For example, defendant's roommate, Katie Hurt, and his brother, Leon Smallwood, are biased witnesses, and the jury could have held their relationships to defendant against their credibility. The State also asserts that Leon's proposed testimony—that defendant was home the night this happened—would have been suspect because defendant's statement indicated Leon FaceTimed defendant after the police arrived at the defendant's mother's home, or—in other words—well after the crime was committed.

¶ 84 "Matters of trial strategy are generally immune from ineffective assistance of counsel claims." *Id.* ¶ 34. Usually, decisions regarding what evidence to present and which witnesses to call are matters of trial strategy, and therefore, cannot serve as the basis for an ineffective assistance of counsel claim. *Id.* ¶ 35.

¶ 85 However, trial counsel is required to "independently investigate any possible defense," and failure to investigate can constitute ineffective assistance of counsel. *People v. Domagala*, 2013 IL 113688, ¶ 38. Counsel is given great deference in his or her investigation decisions, and we judge the decision against a standard of reasonableness. *Id.* As such, counsel must conduct

27

reasonable investigations or make a reasonable decision rendering the particular investigation unnecessary. *Id.*

¶ 86     Here, not only did counsel provide vague answers to the court's question such as "I probably decided [the witness's statement] had no relevance" and "maybe what he told me wasn't going to be relevant one way or the other," counsel admitted he did not investigate every lead that defendant provided him. Of importance, defendant claimed he informed counsel that his roommate, Hurt, and Charles Sanders could provide an alibi for defendant. Defendant acknowledged counsel's investigator spoke with Sanders but claimed that the investigator failed to ask Sanders if he saw defendant walking home that night. Counsel made no mention of Hurt, or whether he asked Sanders if he saw defendant walking home that night or explain why such question was not posed. Ultimately, counsel failed to provide any explanation, let alone a reasonable explanation, as to why he felt such investigation was unnecessary.

¶ 87     The situation here is the same as in *Krankel*, where defendant raised a *pro se* posttrial claim of ineffective assistance, alleging trial counsel failed to contact an alibi witness although defendant informed his attorney how to obtain the alibi and contacted the witness to notify that the attorney would be in touch. *Krankel*, 102 Ill. 2d at 188-89. Our supreme court held that the trial court erred in failing to appoint new counsel for a hearing on defendant's claim of ineffective assistance of counsel. *Id.* at 189.

¶ 88     Defendant need only to raise a colorable claim of ineffective assistance of counsel during a *Krankel* hearing to warrant further proceedings. See *People v. Cook*, 2018 IL App (1st) 142134, ¶ 104. "Without having thoroughly interviewed all of the potential witnesses ***, it was impossible for counsel to determine that their testimony would have been worthless or inconsistent with the theory of self-defense." *People v. Bell*, 152 Ill. App. 3d 1007, 1012-13 (1987). As such,

28

we find the trial court's *Krankel* determination was manifestly erroneous and remand for further proceedings on defendant's ineffective assistance of counsel claim with new counsel.

¶ 89                                    III. CONCLUSION

¶ 90    The sufficiency of the evidence, the State's closing arguments, and counsel's failure to highlight certain portions of Andersson's medical records, do not warrant reversal of defendant's attempted murder conviction. The trial court, however, erred in failing to appoint new counsel for an evidentiary hearing on defendant's *pro se* posttrial ineffective assistance of counsel claim where defendant raised a colorable claim of ineffectiveness. Accordingly, we affirm the conviction but reverse the trial's court *Krankel* determination and remand so the court can appoint new counsel and hold a hearing on such claim.


¶ 91    Affirmed in part and reversed in part.